# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WILLIAM OZAH,                       \*

  Plaintiff                         \*

v.                              \*         Civil Action No. CCB-18-1063

JAMES FRETWELL,              \*
CFC. GRAVES,
SERGEANT C. POOLE, and     \*
CAPTAIN DIEDRICH,
                         \*

  Defendants

                          \*\*\*

## MEMORANDUM OPINION

Plaintiff William Ozah filed the above-captioned civil rights action alleging that he was assaulted by correctional officers while a pretrial detainee. ECF No. 1. The defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 17. Ozah filed a Response in Opposition. ECF No. 21.

The matter is now ripe for review. The court finds a hearing in these matters unnecessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, the defendants' dispositive Motion, construed as a Motion for Summary Judgment, will be DENIED as to Defendants Fretwell, Graves and Poole, and GRANTED as to Defendant Diedrich. Plaintiff's Motion to Appoint Counsel, ECF No. 13, will be GRANTED.

## BACKGROUND

### A. Ozah's Allegations[1]

---

[1] On October 25, 2018, Ozah filed a Motion for Leave to Amend Complaint, ECF No. 20, and Amended Complaint, ECF No. 19, wherein he seeks to amend the amount and nature of damages he is claiming. The motion will be granted. *See* Fed. R. Civ. P. 15(a). He also filed, on August 19, 2019, a motion to amend to add new parties. ECF No. 25. This motion will be denied without prejudice pending appointment of counsel.

Ozah's unsworn complaint predominately concerns the use of force that took place between him and Officers Fretwell and Graves while Ozah was a pretrial detainee at the St. Mary's County Detention Center (SMCDC). Unlike his complaint, Ozah's response in opposition to the pending dispositive motion is sworn. ECF No. 21-3.

Ozah explains that on March 22, 2018, at approximately 9:30 a.m., Fretwell called Ozah to receive medication. ECF No. 1, p. 8. After Ozah received the medication, Fretwell, believing he did not take it, called over the intercom asking Ozah for the medication he had just received. *Id.* Ozah responded that he had swallowed it. *Id.*

Fretwell and Graves then entered the dayroom, grabbed Ozah, and gave commands that he was to be strip searched. ECF No. 1, p. 8. Ozah attempted to comply with the officers' commands, but without warning, Fretwell grabbed him from behind and slammed him to the ground, knocking him unconscious. *Id.* Ozah maintains that he did not act aggressively when approached by Fretwell and Graves. ECF No. 21, p. 5. Ozah was then handcuffed and dragged by Graves and other unknown officers to a back room where he was assaulted. ECF No. 1, p. 8. He was in and out of consciousness and was repeatedly kicked and stomped by Graves and the other officers. *Id.*

While handcuffed behind his back, Ozah was stripped of his pants and underwear and "sexually assaulted." ECF No. 1, p. 8. Ozah states that "private areas of the plaintiff were touched, lifted, and spread, without his consent in an act of voyeurism and harassment by officers, while plaintiff was unresponsive and in a state of unconsciousness against his will." *Id.; see also* ECF No. 21, p. 3. He was then put into a suicide gown and carried into a holding cell. ECF No. 1, p. 8.

Several hours later, Ozah regained consciousness. *Id.* at 9. He had injuries to his head, neck, back, and ankle. *Id.* In response to his request for hospitalization, he was taunted by Graves

who also used racial slurs. *Id.* Ozah was not provided lunch that afternoon, nor was he given toilet paper. *Id.*

Ozah alleges that Fretwell and Graves maliciously assaulted him with the intent to cause harm. *Id.* at 8. As a result of the assault, Ozah continues to suffer from post-traumatic stress disorder, head trauma, neck and back pain, and his right ankle is injured. *Id.*

In his affidavit attached to his opposition response, Ozah states:

> On March 22, 2018, I was incarcerated in the St. Mary's County Detention center, in Leonardtown, Md. That morning I was called by Officer Fretwell to take my medication. I was then accused by him of not taking it and concealing it in my hand. He came into the dorm and asked me for the medication and I replied that I did not have it. I was then grabbed without warning by Officer Fretwell. I put my hands in the air not to show any signs of aggression. I was then grabbed from behind and slammed on my head, knocking me unconscious. I woke up being kicked, punched and in the nude with private parts being touched. I was then knocked back into a state of unconsciousness, later to wake up in the nude in a cell suffering head, neck, back, and 'right ankle' pain from injuries inflicted by officers at the St. Mary's County Detention Center.

ECF No. 21-3 , p. 2.

Ozah has provided portions of his medical records. Medical notes indicate that on March 22, 2018, he was assessed at approximately 9:40 a.m. ECF No. 21-1, p. 5. He responded to a sternal rub and his blood pressure was elevated. *Id.* He reported that his head hurt but the right side of his head did not show anything noteworthy. *Id.* He was strip searched and his vital signs were again assessed; his blood pressure remained high at 150/82-88. *Id.* The notes indicate that the responding nurse was told that Ozah "likes to 'act' like this when has a court date." *Id.* He was assessed again approximately two hours later. *Id.* The provider indicated that when they attempted the pupil reaction check, it "felt as though [the eye lids] were being actively held shut." *Id.*

Ozah submitted sick call slips on March 23, 29, April 3, and April 10, 2018, complaining of neck, ankle, and lower back pain. ECF No. 21-1, p. 3. The notes indicate he received an x-ray of his ankle, but the results are not provided. *Id.* Additionally, on April 6, 2018, Ozah reported to medical with a bloody nose. *Id.* at 5. He complained that this head hurt, he felt dizzy, and that when he leaned forward his nose began to bleed. *Id.* Ozah also provided medical records from his current place of incarceration which reveal he has been treated for back pain; Ozah attributes this pain to the March 22, 2018, incident. ECF No. 21-2.

As to the supervisory defendants, Ozah explains that Captain Diedrich is the Commander of Correction whose duties include "managing the daily operation of the St. Mary's County Detention Center." ECF No. 1, p. 5. Ozah alleges that Diedrich violated his constitutional rights by failing to protect him from the assault and misconduct of the officers. ECF No. 1, p. 6. Specifically, Ozah alleges:

> Diedrich is in the position to set the policies on the code of conduct for the officers, prohibit the use of excessive force, and the proper procedures for the strip searching of inmates to protect inmates from sexual assault. Defendant Diedrich's negligence allowed the two defendants, James Fretwell #348 and CFC Graves #773, as well as other unknown officers at this time, the opportunity to assault, use excessive force, and sexually assault inmates incarcerated in the Detention Center, such as the plaintiff William Ozah.

*Id.* Ozah also filed a grievance that he submitted to Deidrich, which Diedrich denied. ECF No. 9.

Sergeant C. Poole is the shift supervisor whose duties include "managing the daily operation of the assigned shift at the St. Mary's County Detention Center." ECF No. 1, p. 4. Ozah alleges:

> Defendant Sergeant C. Poole, #739 failed in her duties as the shift supervisor, by failure to take action and allowed officers to operate on her shift, with misconduct, Defendant Sgt. Poole #739 knew or should have been aware that the two

4

defendants, James Fretwell #348 and CFC Graves #773, had assaulted and were strip searching an unconscious inmate, the plaintiff William Ozah.

*Id.* at 6. In his opposition response, Ozah notes that Poole was present during the assault and failed to protect him from harm by the conduct of the other officers. *Id.*

Lastly, in his opposition response, Ozah offers that he was accused and criminally charged with exposing himself to a female staff member on March 19, 2018. ECF No. 21, p. 3; *see also* ECF No. 17-21; ECF No. 17-22. Ozah claims in his opposition, for the first time, that the assault by officers on the same shift on March 22, 2018, was in retaliation for Ozah's prior conduct. ECF No. 21, p. 3.

As relief, Ozah seeks monetary damages. ECF No. 1, p. 10 (as amended by ECF Nos. 19, 20).

## B. Defendants' Response and Exhibits

In response to Ozah's allegations, the defendants have submitted affidavits from Defendants Fretwell, Graves and Poole, excerpts from Ozah's medical records, a portion of the video of the incident, and other exhibits.

### i. Fretwell's Account

Fretwell avers that on March 22, 2018, Medic Meagan Ryan was passing out medication. ECF No. 17-8 ¶ 4. Ozah received his medication and removed what Fretwell believed to be one pill and ingested it. *Id.* Ozah then tipped the medication cup into his left hand "dumping the remaining pills out into his hand." *Id.* Ryan noticed this and alerted Fretwell, who then went into the control room to review the camera which had a clear view of the area. *Id.* at ¶ 5. He summoned Ozah over the intercom and directed Ozah to take whatever medication he had in his hand or return it to the medic. *Id.* Ozah denied knowing what Fretwell was talking about. *Id.* Fretwell repeated

5

the directive but Ozah did not respond. Fretwell then advised Ozah that officers would enter the area and that he was not to return to his cell. *Id.* Ozah briefly entered and exited his cell; Graves and Fretwell then entered the Day Room and ordered Ozah to give Fretwell the pills. *Id.* at ¶ 6. Fretwell further states:

> Ozah looked at my open hand and again said that he didn't know what I was talking about. In response, I said, "Okay, now go into the horseshoe!" Ozah didn't move so I again ordered him to "Go into the horseshoe!" When Ozah didn't move, I placed my left hand on his right shoulder. Ozah pulled his shoulder away and began to step backwards towards the television. I stepped in front of Ozah and grabbed his right forearm and again ordered him to "Go into the horseshoe!" In response, Ozah pulled both his hands away and lifted them as he was going to put them up. I pointed to the sliding door and said, "Let's go!"
>
> 7. At this point, I ordered another inmate, Keith Young, to lock into his cell. Young stood up and started to pick his things up from the table. Ozah also complied by starting to walk towards the sliding door. However, Ozah then detoured, and walked towards his cell. Still not knowing where the medication was, I attempted to place Ozah into a straight arm escort hold to assist him into the horseshoe. This is a standard technique taught to officers to control inmates who are disobeying orders. Ozah pulled his arm away and spread his feet into an aggressive stance by slightly moving one foot to the rear of the other, as if to better control his balance. Ozah then clenched his fists, partially squatted down, and placed his fists in front of his waistband.
>
> 8. In a last effort to gain Ozah's compliance, I placed my left hand on Ozah's left arm and my right hand on his right arm. Ozah lifted his arms and shook his body in an effort to shake me off. As he lifted his arms, Ozah tried to strike my head with his elbow. CFC Graves then secured Ozah's right arm to prevent further strikes. I placed my hands under Ozah's arms and used another technique, balance displacement and a modified take down to get Ozah into prone position. I then handcuffed Ozah and double-locked the handcuffs. As Ozah went to the ground, his head did make contact with the floor around his left eyebrow.

ECF No. 17-8 ¶¶ 6–9.

### ii.     Graves's Account

Graves indicates that on the day of the incident Fretwell called for assistance due to an inmate hoarding medication. ECF No. 17-11 ¶ 4. When Graves and Fretwell entered the area they ordered Ozah to return the pill. *Id.* Ozah, who had walked out of his cell, moved away from

Graves and Fretwell, indicating he needed to put his shoes on. *Id.* Graves avers that Fretwell

ordered Ozah "numerous times to put his hands behind his back but Ozah refused. *Id.* Instead of

complying, Ozah kept trying to move past Officer Fretwell and enter his Day Room Cell, Cell C."

ECF No. 17-11 ¶ 5. Graves then ordered inmate Keith Young, who was sitting at the day room

table, to lock into his cell. Ozah remained non-compliant and Fretwell secured Ozah's left arm

and shoulder while Graves attempted to secure Ozah's right arm. *Id.* at ¶ 6. Graves further

explains:

> 7. Ozah actively resisted by trying to pull away form Officer Fretwell. Ozah had clenched both his fists and tried to assume a fighter's stance. I was able to grab Ozah's right arm but was unable to fully secure it. Deputy Fretwell then executed a take-down maneuver and tried to get Ozah handcuffed. Ozah refused to place his right hand behind his back. Young was still standing at the Day Room cell door, with the door unsecured. I then stood in a "blade" position towards Young as I did not want to turn my back on him or Officer Fretwell.
>
> 8. I then unholstered my agency Taser and gave a loud verbal warning to Ozah, "Taser! Taser! Taser! The red targeting dot was aimed at the back of Ozah's right shoulder. Ozah immediately placed his right hand behind his back to be handcuffed. As a result I did not deploy the Taser.

ECF No. 17-11 ¶¶ 7–8.

Other officers stood Ozah up to escort him out of the day room. ECF No. 17-11 ¶ 10. As

they began to move him, Ozah dropped his body weight and refused to stand on his own. *Id.* He

was carried out in the hallway where Graves relieved one of the officers. The other officers and

Graves then escorted Ozah to "Post II" where he was placed on a bench along a wall. *Id.* Once

seated on the bench, Ozah pushed out from the wall "trying to fall to the ground." *Id.* at ¶ 11.

Officers, including Graves, held Ozah on the bench while he continued to push and attempt to fall

to the ground. *Id.*

Licensed Practical Nurse ("LPN") Friggs examined Ozah. ECF No. 17-11 ¶ 12. Friggs

applied a sternum rub to Ozah's chest and obtained an immediate positive reaction. *Id.* "He had

Ozah open his eyes and follow the light. Ozah complied. LPN Friggs then examined Ozah's head and detected no signs of trauma or injury. He also determined that Ozah's vital signers [sic] were normal and determined that Ozah did not need to be sent to hospital." *Id.*; ECF No. 17-8 ¶ 10.

Graves avers that during the examination, Ozah attempted "to lock his legs out and tri[ed] to move his body so that he would fall from the bench" but Graves and another officer held Ozah and prevented him from succeeding. ECF No. 17-11 ¶ 13.

Ozah was then escorted to the Post II Processing Room to be strip searched. ECF No. 17-11 ¶ 14. Ozah refused to comply with any orders. *Id.* After the search he was placed in a suicide prevention gown because he refused to speak to anyone or to verbally commit to safety. *Id.*

Friggs re-examined Ozah and cleared him to be placed in a holding cell. *Id.* Ozah refused to walk and again dropped his weight, requiring the officers to carry him to the holding cell. *Id.* He was placed in the holding cell and observed every fifteen minutes. *Id.* When placed in the cell, Friggs again examined Ozah, obtained his vital signs, and noted no evidence of injury. *Id.* at ¶ 15.

Graves then assisted in the search of Ozah's cell, which uncovered contraband but not the missing medication. ECF No. 17-11 ¶ 15. Ozah was charged with administrative violations, including possession of unauthorized property and disobeying verbal orders. ECF No. 17-8 ¶ 10; ECF No. 17-15; ECF No. 17-27, p. 2. He was subsequently found guilty of disorderly conduct, threat to staff, and disobeying verbal orders after review of the camera footage showed him palming his medication[2] and failing to obey staff orders. ECF No. 17-16, p. 3. He was also found guilty of possessing contraband. *Id.*

### iii.     Video Footage

---

[2] This video has not been provided to the court.

8

The video of the incident provided to the court is from a stationary camera in the day room.[3] ECF No. 17-2 (filed separately with the clerk's office as "Exhibit 7"). The footage is one minute and 16 seconds long and without sound. It does not include anything prior to Fretwell coming into the day room; Ozah's alleged palming of his medication is not shown. The video does not show Ozah being removed from the day room or any of the events which occurred after Fretwell applied handcuffs to Ozah.

At the beginning of the video, the camera displays March 22, 2018, 9:34:15 a.m. on the bottom right. Ozah is seen standing at a table talking to inmate Young, who is sitting on a table when Fretwell enters the day room followed immediately by Graves. Fretwell approaches Ozah while speaking to him. Ozah turns toward Fretwell, who immediately puts his left hand on Ozah's right shoulder; Ozah then pulls back. *Id.* at. 9:34:20. Fretwell is seen saying something else to Ozah, again reaches for him, and motions toward the door. Ozah steps back and puts his hands up. *Id.* at 9:34:24. Fretwell continues to talk to Ozah as Young gets off of the table and the officers appear to address Young. Graves walks to the cell closest to the camera, away from Ozah and Young, and removes a towel that is hanging on the door so that the cell door can be closed. Young walks to his cell door but does not lock in. Ozah begins to walk forward, his body turns slightly, and Fretwell puts his hands on Ozah, appearing to guide him. Ozah appears to lean toward a cell door away from Fretwell and Fretwell grabs Ozah from behind by both arms. Ozah's fists are clenched at his waist. *Id.* at 9:34:38. The two scuffle, and as the officers try to control Ozah, his arms raise. Fretwell then pulls Ozah to the ground from behind as Graves pushes him from the

---

[3] Ozah has also filed a request for additional video evidence. He argues that the video presented to the court is incomplete and is clipped to show a short account of the incident. ECF No. 22, p. 1. He complains that the video does not include Ozah's removal from the day room, his being placed on the "booking bench," his escort to the processing room, or his strip search. *Id.* Records indicate that additional video of at least the escort to the processing room was taken and that in order to preserve privacy the video camera was turned to the wall during the strip search. ECF No. 17-14. This video evidence inexplicably has not been provided to the court.

front. By 9:34:43 on the video, Ozah is on the ground and both officers are in control. A third male officer then comes into the day room. *Id.* at 9:34:44. He locks Young into his cell as Poole arrives on the scene and stands over Fretwell, who is handcuffing Ozah on the ground. *Id.* at 9:34:50. The application of the handcuffs occurs at the far end of the day room and Ozah is obscured by three officers. Ozah does not appear to resist the application of the handcuffs and appears motionless on the ground. Fretwell begins applying handcuffs at 9:34:57; he is finished and beginning to stand at 9:35:24. *Id.*

### iv. Poole's Account

Officer Poole explains that Post III where Ozah was housed is a maximum-security unit divided into two separate housing units, each with a day room and four cells. ECF No. 17-13 ¶ 3. On the day of the incident, she responded to a call that an officer needed assistance on Post III. *Id.* She was advised that Ozah had taken medication out of the distribution cup and had taken the unknown pill into his cell. *Id.* When Poole arrived on Post, Ozah was on the ground and Fretwell was attempting to place handcuffs on him. ECF No. 17-13 ¶ 4. Poole avers that Graves entered the post a few seconds after her[5] and ordered Ozah to put his hands behind his back or he would be tased. *Id.* After being warned that he would be tased, Ozah complied with the commands regarding handcuffing; the taser was not used. *Id.* at ¶ 4. Poole then secured the cell door of Inmate Young.[6] *Id.* at ¶ 5.

Poole reports that Ozah did not indicate he was injured and refused medical treatment. *Id.* He was escorted to the Booking Area in Post II and placed on the Booking Bench. *Id.* He refused to answer any questions from officers or medical staff, but stated that his head hurt. *Id.*

---

[5] Poole's recollection of when Graves entered the post is contradicted by the affidavits of Fretwell, Graves, and Ozah.
[6] Poole's recollection regarding securing the door is contradicted by the video evidence which shows a male officer locking Young into his cell.

Poole explains that Ozah refused to comply with orders given for the strip search, including the order to move to the processing room. *Id.* at ¶ 6. He refused to walk and was carried with his feet dragging behind him. *Id.* Ozah refused to remove his clothes, forcing officers, including Graves, to remove his clothing. *Id.*

After the search, Ozah was placed in a suicide wrap due to his refusal to verbally commit to safety or answer any questions from medical staff. *Id.* at ¶ 7. Ozah again refused to walk and was carried and placed on a bunk in the holding cell. He remained on the bunk, not moving but visibly breathing. *Id.* at ¶ 7.

### v.     Incident Report

Officer Luis Dompenciel prepared an incident report indicating he arrived on Post III in response to the call of an officer in need of assistance. ECF No. 17-17. When he arrived, Ozah was on his stomach and in handcuffs. As Ozah was being moved to Post II, he yelled to inmate Young to contact "his people" to tell them what happened. As Ozah was being assisted up "he went limp and would not walk." *Id.* Ozah was escorted to Post II by Graves and Cpl. Dunkin. *Id.* "The whole way Inmate Ozah would not walk and appeared to be unconscious." *Id.* Ozah was placed on the bench but kept flexing and pushing off the wall so that he had to be held in place. He was directed to stop flexing and to sit against the wall. *Id.*

LPN Friggs took Ozah's vital signs and gave him a sternum rub and "[Ozah] woke up and asked what happened. Inmate Ozah stated that he hit his head and stopped talking. [Friggs] then broke the ammonia inhalant and held it near his nose and Inmate Ozah kept moving his head away from it." *Id.*

Ozah was cleared and taken to the processing room where he was strip searched by Graves, Officers Mysz and Zunbrun, and Dompenciel. *Id.* Dompenciel reported that during the search

Ozah did not move and no contraband was found. *Id.* Ozah was then put into a green gown and placed in the holding cell on 15-minute mental health checks. *Id.*

### vi. Medical Notes

Kristi Larson, LCSW, examined Ozah on March 22, 2018. ECF No. 17-18, p. 3. She noted he was being seen at the request of security, who reported that Ozah was placed on suicide watch earlier after an act of aggression toward security. *Id.* She also noted that, after the incident, Ozah was seen by medical and that "at that time he could not communicate with anyone nor would he commit to safety." *Id.* According to Larson, Ozah stated that he did not remember what happened, but also insisted he did not do anything wrong. *Id.* Larson described Ozah's thoughts as clear and logical, but he exhibited little engagement with her other than wanting clothes and to use the phone. Due to his uncooperativeness, Larson was not able to assess whether Ozah was a risk to himself or others, and she recommended he remain on suicide watch. *Id.*

The following day Ozah was seen by Wendy Drys, CRNP. *Id.* at p. 2. Ozah complained of right ankle pain and pain over the entire top of his head. *Id.* He was provided ibuprofen for pain and advised to rest quietly due to the head injury and to avoid excessive weight bearing. *Id.* An x-ray of the left ankle was ordered. *Id.*

### STANDARD OF REVIEW

The defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on October 15, 2018. ECF No. 17. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). When the grounds for dismissal are based solely on the contents of the complaint, the court must dismiss under Rule 12(b)(6) if the complaint does not allege enough

facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The court must examine the complaint as a whole, consider the factual allegations in the complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and construe the factual allegations in the light most favorable to the plaintiff. *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment when matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give all parties "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* A "reasonable opportunity" means that (1) the nonmoving party has had some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment and (2) the nonmoving party was "afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district court on notice of the reasons why summary judgment is premature, *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002). Here, plaintiff has not filed a Rule 56(d)

affidavit.[7] Under these circumstances, the court will construe the defendants' motion as a motion for summary judgment.

Under Rule 56, the court will grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the defendants' motion, the court views the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden of showing a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

## ANALYSIS

### A. Claims against Fretwell, Graves, and Poole

The Fourteenth Amendment's Due Process Clause "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). "[T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." *Id.* It is enough that "a pretrial detainee show that the 'force purposely or knowingly used against him was objectively unreasonable,' regardless of an officer's state of mind." *Dilworth v. Adams*, 841 F.3d

---

[7] Ozah has, however, sought additional video of the incident. ECF Nos. 22, 23.

14

246, 255 (4th Cir. 2016) (quoting *Kingsley*, 135 S.Ct. at 2472). Pursuant to *Kingsley*, this court must consider whether, under the "facts and circumstances" of this particular case and from the "perspective of a reasonable officer on the scene," the force used against Ozah was objectively excessive. *See Kingsley*, 135 S.Ct. at 2473.

The Fourteenth Amendment also provides that pretrial detainees must be protected from a known risk of harm. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004). The standards for assessing a failure to protect claim raised by a pretrial detainee are the same as those applied for an Eighth Amendment claim brought by a convicted inmate. *See, e.g., Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (finding that no determination as to whether the plaintiff was a pretrial detainee or a convicted prisoner was necessary because "the standard in either case is the same—that is, whether a government official has been 'deliberately indifferent to any [of his] serious medical needs'" (quoting *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990)) (alteration in original)); *Parrish*, 372 F.3d at 302 n.11 (noting that the standard applicable to a pretrial detainee's claim of failure to protect "is the same as that which applies in cases arising under the Eighth Amendment," and, accordingly, finding cases applying Eighth Amendment standards "relevant to the Fourteenth Amendment claim here").

To establish a failure to protect claim, a prisoner must show: (1) that he suffered significant injury or was "incarcerated under conditions posing a substantial risk of serious harm"; and (2) that the prison official at issue had a "sufficiently culpable state of mind." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Under the first prong, which is an objective inquiry, "a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions," *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)), "or

demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions," *id.* (citing *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993)). The second prong is subjective and requires proof of deliberate indifference. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). Ultimately, "the test is whether the [prison officials] know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corrs.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). "[I]nmates have an Eighth Amendment right to be protected from malicious attacks, not just by other inmates, but also from the very officials tasked with ensuring their security." *Thompson v. Virginia*, 878 F.3d 89, 109 (4th Cir. 2017) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

The defendants' version of the March 22, 2018 encounter conflicts with Ozah's version of events. The defendants contend that Ozah failed to comply with Fretwell's directives and moved in an aggressive manner toward Fretwell, necessitating the take down in the day room. Thereafter, they contend that Ozah faked unconsciousness and deliberately refused to cooperate with his escort and strip search. They do not address Ozah's contention that after he was taken to the processing room, he was assaulted by staff. They also dispute the nature and extent of any injuries suffered by Ozah. Fretwell, Graves and Poole each submitted an affidavit in support of their version of events. ECF Nos. 17-8, 17-11, 17-13. Although Ozah's complaint was not made under penalty of perjury, Ozah's response, ECF No. 21-3, was sworn. Ozah alleged:

> I was then grabbed without warning by Officer Fretwell. I put my hands in the air not to show any signs of aggression. I was then grabbed from behind and slammed on my head, knocking me unconscious. I woke up being kicked, punched and in the nude with private parts being touched. I was then knocked back into a state of unconsciousness, later to wake up in the nude in a cell suffering head, neck, back, and 'right ankle' pain from injuries inflicted by offices at the St. Mary's County Detention Center.

16

*Id.* at 2.

The allegations that Fretwell and Graves each used physical force against Ozah—despite the fact that he posed no threat to either of them—while Poole stood by and failed to intervene, describes an objectively unreasonable use of force, coupled with a failure by Poole to protect Ozah from a known risk of harm. Given that Ozah's sworn statement is fundamentally inconsistent with the evidence produced by Fretwell, Graves, and Poole, and in light of the liberal construction afforded to Ozah as a pro se litigant, the court will deny the Motion for Summary Judgment as to Fretwell, Graves, and Poole. The issues require credibility determinations not appropriate for resolution on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**B.     Claims against Diedrich**

It is well established that the doctrine of respondeat superior does not apply to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Although Ozah alleges that Diedrich was aware of the situation, Ozah does not allege that Fretwell or Graves planned in advance to use force or to strip search Ozah and that, if they did, Diedrich was aware of such a plan. Although Ozah contends that Diedrich was aware of his subordinate's actions, nothing in Ozah's allegations suggests that Diedrich had knowledge of the use of force, strip search, or any other concerning behavior, but failed to act. Accordingly, Ozah cannot succeed on a claim against Diedrich premised on supervisory liability.

## C. Qualified Immunity

Defendants also argue that they are entitled to summary judgment based on qualified immunity. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Additionally, "qualified immunity protects law officers from bad guesses in gray areas and it ensures that they may be held personally liable only for transgressing bright lines." *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (internal quotation marks omitted). Qualified immunity is a defense from suit, not simply liability; the defense is effectively lost if a matter is improperly permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Resolution of whether an official is entitled to qualified immunity must be determined "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In order to determine if a public official is entitled to the protections afforded by qualified immunity, two inquiries must be addressed by this court. The first is whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overturned by *Pearson v. Callahan*, 555 U.S. 223, 235–36 (2009), to the extent that *Saucier* required courts to

address the two inquiries in a particular order). The second inquiry is whether the right was "clearly established" at the time of the events at issue. *Id.* If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability. The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (internal quotations omitted).

Having resolved the claims against Diedrich in his favor, the qualified immunity analysis is necessary only as to Defendants Fretwell, Graves and Poole. Construed in the light most favorable to plaintiff, the conduct alleged—unprovoked assaults by Fretwell and Graves, followed by a strip search while plaintiff was unconscious, all occurring while Poole stood by and failed to intervene—unquestionably establishes a violation of a pretrial detainee's well-established constitutional right to be free from excessive force and the denial of due process. Accordingly, Fretwell, Graves, and Poole are not entitled to qualified immunity.[8]

## CONCLUSION

For the foregoing reasons, the defendants' dispositive motion, construed as a Motion for Summary Judgment, will be granted as to all claims asserted against defendant Diedrich, and will be denied as to defendants Fretwell, Graves, and Poole. Ozah's motions to appoint counsel, ECF No. 13, and for leave to amend, ECF No. 20, will be granted.

A separate Order follows.

_____8/28/19_____
Date

_____*CCB*_____
Catherine C. Blake
United States District Judge

---

[8] Obviously, the defendants dispute the facts underpinning plaintiff's claims. The qualified immunity analysis, however, considers the facts in the light most favorable to the plaintiff. *Saucier*, 533 U.S. at 201.