**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| WILLIAM OZAH | * | |
| | * | |
| | * | Civil Action No. CCB-18-1063 |
| v. | * | |
| | * | |
| JAMES FRETWELL, *et al.* | * | |
| | * | |
| | * | |
| | ***** | |

**MEMORANDUM**

Plaintiff William Ozah alleges in this civil rights action that correctional officers assaulted him while he was in pretrial detention. He has brought claims for excessive force and failure to protect against the defendants,[1] who have moved for summary judgment. (ECF 44). The matter is fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons stated herein, the court will grant the defendants' motion as to all counts.

**FACTS**

In this excessive force and failure to protect case, plaintiff William Ozah has submitted in opposition to the defendants' motion for summary judgment an affidavit setting forth the series of events giving rise to his claims, which revolve around two separate but related incidents. (*See generally* ECF 47-3, Ozah Aff.).[2]

---

[1] The defendants include James Fretwell, CFC Michael Graves, Sergeant Catherine L. Poole, C.O. Myers, C.O. Hersh, C.O. Zumbrum, Corporal Dunkin, and CFC Luis Ramos Donpenciel. Ozah concedes that Poole and Dunkin are entitled to judgment in their favor. (*See* ECF 47 at 6). The court will therefore grant as unopposed the defendants' motion as to these defendants and will focus its analysis on the remaining six defendants: Fretwell, Graves, Myers, Hersh, Zumbrum, and Donpenciel. Additionally, Donpenciel's name is incorrectly spelled as "Dompenciel" on the docket; the Clerk will be directed to adjust the spelling accordingly.

[2] The court sincerely appreciates the representation provided to Mr. Ozah by appointed pro bono counsel.

1

## I. The First Incident: The Takedown

The first incident involves allegations that correctional officers slammed Ozah to the ground in the midst of an altercation arising from Ozah's purported refusal to produce medication. Ozah declares that on March 22, 2018, while incarcerated at St. Mary's County Detention Center and awaiting trial, he was given two pills by the medical staff, which he swallowed as instructed. (*Id.* ¶¶ 2–4). Shortly afterward, according to Ozah, the defendant James Fretwell called to Ozah over the facility's intercom and asked that he produce the medication he had been provided; Ozah responded that he had already swallowed it. (*Id.* ¶¶ 7–8). At this point, Fretwell and defendant Michael Graves entered the common area and again demanded that Ozah produce the medication, and Ozah again responded that he had already swallowed it. (*Id.* ¶¶ 9–10). Fretwell then ordered Ozah to accompany him to a secure portion of the facility called the horseshoe, but before Ozah could comply he was grabbed by Michael Graves and by Fretwell, who "lifted me into the air and slammed me to the ground," causing Ozah to hit his head and lose consciousness. (*Id.* ¶¶ 11–13).

In moving for summary judgment, the defendants have produced deposition testimony of the officers involved and video footage capturing some of the encounters. Fretwell testified that he was alerted by the medic that Ozah did not take his medication and that he then reviewed the video to confirm this; though Fretwell could not recall the video exactly, and though this video was not preserved, Fretwell testified that Ozah appeared not to ingest some medications, instead transferring them to his hand. (ECF 44-7, Ex. 5, Fretwell Dep. at 26–27). As a security measure, Fretwell testified that if Ozah did not cooperate with verbal orders, he had to conduct a strip search and a cell search to make sure the medication was not on his person or in his possession. (*Id.* at 29–30). Fretwell then entered the common area to confront Ozah, but Ozah "continued to defy verbal orders." (*Id.* at 31). When Ozah attempted to walk into his cell, Fretwell testified he grabbed

2

Ozah by his shoulders to redirect his body towards the cell next to Ozah's and Ozah "took an aggressive stance" and "tightened up his shoulders, clenched his fists and put them in front of his body into a fighting position." (*Id.* at 32). Fretwell responded by conducting a "takedown," bringing Ozah to the ground and placing him in handcuffs, after which Ozah called out to a fellow inmate. (*Id.* at 32, 35–36). Though Fretwell indicated in his incident report that the manner in which Ozah was taken to the ground could have produced an injury, he believed that Ozah was in a "mock catatonic state" given that just seconds before he lay still he made a clear statement to his fellow inmate (who was not secured at that time) with "no sign of any distress with his tone of voice or within his movements." (*Id.* at 38, 42). Fretwell left the area to seek medical treatment for himself. (*Id.* at 36). Graves's testimony was similar. After some amount of "normal interaction" about the medication, "Mr. Ozah went into like a fighting stance" with his hands up and fists balled, leading to a takedown. (ECF 44-8, Ex. 6, Graves Dep. at 19).

Additionally, the video footage shows events consistent with Fretwell's and Graves's recollections. Ozah resists being directed by Fretwell. (ECF 17-10, Ex. 7 at 00:23) (on file with Clerk's Office). While there is a "takedown," the video evidence does not indicate that Ozah was lifted into the air and slammed to the ground, as Ozah claims. (*Id.* at 00:27).

## II. The Second Incident: The Strip Search

The second incident involves an alleged assault, which Ozah says occurred while officers performed a strip search on him in an effort to uncover the purportedly missing medications. Specifically, Ozah declares that when he regained consciousness following his altercation with Fretwell, he could feel himself "being kicked and punched for what felt like thirty seconds to a minute" while he lay on his chest naked and handcuffed. (ECF 47-3, Ozah Aff. ¶¶ 14–16).

Graves testified that after Fretwell left, a medic came to attend to Ozah and officers transferred Ozah to the booking area, where they secured him on a bench prior to taking him into another room to conduct the strip search. (ECF 44-8, Ex. 6, Graves Dep. at 25–28). The video evidence shows that officers helped hold up Ozah, who was verbally nonresponsive and limp, on a bench in the booking area for approximately four minutes while a medic checked his vitals and gave him a sternal rub.[3] (ECF 44-12, Ex. 10). The medic said his vitals were "fine" and that he responded to the sternal rub, "which means he's not really unconscious." (*Id.* at 1:09). One officer said that they still needed to search Ozah because he was apparently hiding medication. After waiting for a supervisor to arrive and for the medic to evaluate Ozah, officers carried him into a room to perform a strip search. The video did not follow Ozah into the room where the strip search occurred, but the camera remained around a corner where it continued to pick up audio for approximately three and a half minutes. Officers could be heard talking and could be seen watching calmly. The only other sound was that of metal banging.[4] When the camera entered the room, Ozah was handcuffed and lying face down on the ground in a gown; officers stated that they searched him and that he kept trying to let his head fall but they made sure he did not fall. A medic was called in to check on Ozah again, but Ozah did not respond to any inquiries from the medic. Officers then could be seen lifting Ozah off the ground to carry him to a cell. When Ozah was placed in his cell, officers asked the medic to check Ozah's vitals one more time. (*Id.* at 10:18). After checking (*Id.* at 10:35), the medic noted that Ozah "does not look like someone who is passed

---

[3] There is also testimony that the medic gave Ozah an ammonia tablet to try to revive him, and that he responded in some manner to this. (ECF 44-15, Ex. 13, Donpenciel Dep. at 20–21)

[4] Officers testified that the sound of metal banging may have been caused by officers bumping into a metal cabinet in the crowded room, (*see, e.g.*, ECF 44-11, Ex. 9, Poole Dep. at 29), and the video shows that the same banging sound occurs as officers lift and carry Ozah from the room where he was strip searched, (*see* ECF 44-12, Ex. 10 at 9:52–54).

4

out and unconscious from having a seizure" and remarked positively on Ozah's vitals, not reporting on video that he observed any signs of injury. (*Id.* at 10:44; 11:20–39; 12:05–10). There is no medical evidence supporting Ozah's claims of being kicked and punched during the strip search.

## PROCEDURAL HISTORY

Ozah filed this action on April 12, 2018. (ECF 1). The defendants filed a motion to dismiss his complaint, or in the alternative for summary judgment, on October 15, 2018. (ECF 17). The court granted in part and denied in part the motion on August 28, 2019. (ECF 27). Ozah also filed a motion for the court to appoint counsel to represent, which the court granted. (*Id.*). On April 6, 2020, Ozah filed an amended complaint raising four counts under 42 U.S.C. § 1983 for: (1) excessive force against Fretwell and Graves; (2) excessive force against Graves, Myers, Hersh, Zumbrun, Dunkin, and Donpenciel; (3) failure to protect against Graves, Myers, Hersh, Zumbrun, Dunkin, and Donpenciel; and (4) failure to protect against Poole.[5] (ECF 37). On October 8, 2020, the defendants moved for summary judgment. (ECF 44). That motion is fully briefed and is ripe for resolution.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*,

---

[5] As explained previously, judgment will be awarded to the defendants on Count IV, which implicates only Poole.

5

673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). But where video evidence sufficiently discredits a party's a version of events such that no reasonable jury could believe it, there is no genuine issue of material fact. *Scott*, 550 U.S. at 380; *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009).

## DISCUSSION

In this case, Ozah alleges that the defendants violated his constitutional rights; he raises excessive force and failure to protect claims pursuant to 42 U.S.C. § 1983. The court will address the excessive force claims and then the related failure to protect claims.

### I. Excessive Force

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). The standard is objective, and courts are to ask whether an officer's actions are objectively reasonable in light of the facts

and circumstances confronting them. *Lombardo v. City of St. Louis*, 141 S.Ct. 2239, 2241 (2021) (quoting *Graham*, 490 U.S. at 397). These circumstances include, but are not limited to, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (quoting *Kingsley*, 576 U.S. at 397). A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained" and must "appropriately defer" to the policies and practices that are "needed to preserve internal order" and "maintain institutional security." *Kingsley*, 576 U.S. at 397 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). At bottom, a court is to determine whether "the challenged governmental action is not rationally related to a legitimate governmental objective or [whether] it is excessive in relation to that purpose." *Id.* at 398. The court's determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with 20/20 vision of hindsight." *Id.* at 397. Here, Ozah asserts excessive force claims against defendants Fretwell and Graves in Count I and against defendants Graves, Myers, Hersh, Zumbrun, and Donpenciel in Count II. The court will address each count in turn.

    A.    *Count I*

Ozah's first excessive force allegation claim is based on the events of the takedown, when Fretwell and Graves confronted Ozah about producing the medication that he had allegedly not swallowed. Fretwell argues that Ozah intentionally ignored Fretwell's order to produce his medication or be escorted from the day room for a strip search. He argues that his actions were not intended to physically punish Ozah, but instead that they had a valid penological basis: If Fretwell

believed (even incorrectly) that Ozah had not taken his medications, he had an obligation to search Ozah in order to prevent the possible misuse of the pills. Graves, meanwhile, maintains that he did little in the altercation, merely assisting Fretwell but not using any force to secure Ozah and deciding not to use his unholstered taser.

Ozah responds that the reasonableness of Fretwell's actions depends on the parties' opposing accounts of the medicine distribution and on Fretwell's credibility. He maintains that he took his medication as directed and gave no reason for the confrontation; regardless, he argues, any interest in controlling medications in jail does not inherently justify the use of force — certainly not the extreme force he alleges Fretwell used.

Even considering the evidence in the light most favorable to Ozah, the video of the event quiets any possible genuine disputes of fact here. It confirms the defendants' accounts, revealing that Ozah ignored verbal orders and walked toward his cell, assuming a physical posture of resistance when Fretwell attempted to redirect him, and that Fretwell executed a takedown far short of — as Ozah alleges — lifting Ozah into the air and slamming him into the ground. The video sufficiently discredits Ozah's account to the point where no reasonable jury could believe it, so the court will grant the defendants' motion as to Count I.

    *B.   Count II*

Ozah's excessive force claim in Count II is based on his allegations that Graves, Myers, Hersh, Zumbrun, and Donpenciel participated in the second alleged assault during Ozah's strip search. The defendants argue that there is no evidence in the record to support these allegations, which they believe are contradicted by the video evidence and by the officers' depositions. In opposition, Ozah points only to his own affidavit, which states: "As I lay on the ground, I could also feel myself being kicked and punched for what felt like thirty seconds to a minute." (ECF 47-

3, Ozah Aff. ¶ 15). Though the video does not depict visual footage of the strip search during which Ozah declares he was assaulted, it depicts officers at the entrance to the room talking and watching calmly. (*See* ECF 44-12, Ex. 10 at 5:30–9:07). No sounds indicate physical blows, a scuffle, or an assault, other than perhaps the tinny sound of thin metal rattling. (*Id.*). But even as to the sound of metal rattling, which could raise an inference of some kind of physical altercation, there is evidence that this sound was produced by the rattling of the door to a metal cabinet, which is visible in the small and crowded room after the strip search has concluded and which rattles again in the same manner when officers lift Ozah to transport him to his cell. (*Id.* at 9:53–56; *see also* ECF 44-11, Ex. 9, Poole Dep. at 29). The officers state on video after the search has concluded that Ozah kept trying to let his head fall but they made sure he did not fall. (ECF 44-12, Ex. 10 at 9:40–45). The medic was nearby throughout the events and examined Ozah both before and afterward. (ECF 44:12, Ex. 10 at 00:00–01:36; 10:18–12:10).

Of course, the court must view this evidence in the light most favorable to Ozah and draw all reasonable inferences in his favor. In this case, though, is not reasonable to infer from the video evidence that Ozah was kicked and punched for thirty to sixty seconds during his strip search. All the officers allegedly involved in the incident denied witnessing or participating in Ozah's assault. The only evidence supporting Ozah's excessive force claim in Count II is therefore his own affidavit, which states in one line in conclusory fashion that he felt like he was being kicked and punched for thirty to sixty seconds. This affidavit, uncorroborated by any other evidence in the record and inconsistent with the available video evidence, is insufficient by itself to withstand a motion for summary judgment. No reasonable jury could find by a preponderance of the evidence that Ozah is entitled to a verdict in his favor based on the evidence adduced. Accordingly, the court will grant the defendants' motion as to Count II. *See Anderson*, 477 U.S. at 249–50 (no issue for

trial unless there is sufficient evidence favoring the nonmoving party to return a verdict for that party and noting that if evidence in the record is merely colorable or not significantly probative, then summary judgment may be granted).[6]

## II. Failure to Protect

The Fourteenth Amendment provides that pretrial detainees must be protected from a known risk of harm. *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004). The standards for assessing a failure to protect claim raised by a pretrial detainee are the same as those applied for an Eighth Amendment claim brought by a convicted inmate. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). To prevail on a failure to protect claim, a pretrial detainee must show (1) he suffered a significant injury or was "incarcerated under conditions posing a substantial risk of serious harm" and (2) the prison official who failed to protect him had a "sufficiently culpable state of mind." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The first prong is an objective inquiry asking whether a prisoner has suffered "a serious or significant physical or emotional injury resulting from the challenged conditions," or whether he has "demonstrate[d] a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks omitted). The second prong is a subjective inquiry and requires proof of deliberate indifference. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). At bottom, the test is whether prison official knows "the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C.*

---

[6] The defendants also argue that Ozah's allegations are insufficient as a matter of law because they do not specifically describe which defendant engaged in which act. The court need not reach this argument.

*Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Ozah's failure to protect claim in Count III is based on his allegations that Graves, Myers, Hersh, Zumbrun, and Donpenciel participated in—or at least witnessed and failed to stop—the second alleged assault. Because the court has already concluded that the defendants are entitled to summary judgment on the excessive force claim with respect to the incident during the strip search, the failure to protect claim must also fail. If no reasonable jury could find by a preponderance of the evidence that Ozah was even assaulted in the first place, neither could they find that officers failed to protect him from the alleged assault. Accordingly, the court will grant the defendants' motion as to Ozah's failure to protect claim. *See Anderson*, 477 U.S. at 249.[7]

## CONCLUSION

For the reasons discussed herein, the court will grant the defendants' motion as to all counts. A separate Order follows.

9/23/2021
Date

/s/
Catherine C. Blake
United States District Judge

---

[7] The defendants argue again that Ozah's allegations are insufficient as a matter of law because they do not specifically describe which defendant engaged in which act. As stated previously, the court need not reach this argument.